**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES M. LAYDEN, )<br>)<br>Plaintiff, )<br>)  Civil Action No. 05-165 Erie<br>)<br>v. )<br>)<br>JO ANNE B. BARNHART, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | |

<u>**MEMORANDUM OPINION**</u>

McLAUGHLIN, J.

     Plaintiff, James M. Layden, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. Layden filed an application for DIB on March 13, 2003, alleging disability since February 7, 2003 due to depression, anxiety and nervousness (Administrative Record, hereinafter "AR", 57-59, 68). His application was denied, and Layden requested a hearing before an administrative law judge ("ALJ") (AR 36-40). Following a hearing held on April 23, 2004, the ALJ found that Layden was not entitled to a period of disability or disability insurance under the Act (AR 14-24, 164-201). Layden's request for review by the Appeals Council was denied (AR 4-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will deny the Plaintiff's motion and grant the Defendant's motion.

**I. BACKGROUND**

     Layden was born on March 25, 1939, and was 65 years old on the date of the ALJ's decision (AR 15, 57). He is a high school graduate, with past relevant work experience as an accounts payable/receivable assistant and purchasing manager (AR 69). He currently receives

$1,225.00 per month in Social Security retirement benefits, and $817.30 per month from his company pension (AR 17, 171).

Layden was seen by Raymond A. Haibach, M.D., on September 26, 2002 and reported he was under a lot of stress at work (AR 127). He complained of tiredness, lack of energy and sleeplessness (AR 127). Dr. Haibach diagnosed work stress with mild depression, and discussed the situation with Layden, who was trying to decide whether to retire (AR 127). Layden was prescribed Prozac (AR 127).

Layden returned on November 7, 2002 and reported that the Prozac had helped his nerves "a little bit" but did not help with the stress (AR 126). He still felt tired during the day and did not sleep well at night (AR 126). Dr. Haibach diagnosed work stress with underlying depression/anxiety (AR 126). He increased his Prozac dosage, recommended he cease work for one month, and suggested he see a counselor (AR 126).

On November 14, 2002, Layden was seen by Glenn T. Bailey, M.A., C.R.C. (AR 143). Layden reported that over the last several months his work load had increased, he lost his clerical help, and felt stressed and overwhelmed (AR 143). He did not believe he could handle the volume of work, but was fine at home (AR 104). Mr. Bailey found he was pleasant and cooperative, but was quite nervous and expressed fears of not being able to perform his job (AR 104, 143). Mr. Bailey diagnosed him with acute stress disorder and dysthymic disorder (AR 143). He opined that he appeared to be suffering from the typical symptom cluster normally seen in individuals experiencing emotional "burn out" (AR 143).

According to Mr. Bailey, Layden reported that his Prozac had decreased his anxiety along with his depression, but he still suffered disruptive sleep (AR 143). He indicated that he had difficulties with concentration, but Mr. Bailey found that that was expected with a severe stress reaction (AR 143). He found that overall, Layden did not present with any word retrieval problems, nor did he appear to have any significant memory impairments (AR 143). Mr. Bailey concluded that his reported memory difficulties were most likely attributable to his depression

and anxiety (AR 143). Layden was adamant that he wanted to work and found his work fulfilling, but believed he could no longer maintain the high pressure pace he was carrying for the company (AR 143-144). Mr. Bailey felt he was sincere in his desire to return to work (AR 144). He recommended that Layden not only decrease his work load, but reorganize how he performed his job (AR 144). Layden was open to his suggestion and to the possibility of working at another job in the plant (AR 144). He preferred an assistant to help him, but if that was not possible, he wanted to be reassigned to a different position within the company (AR 144).

Mr. Bailey recommended that he reduce his work day to four hours per day for the next thirty days and then undergo a reevaluation (AR 144). He opined that Layden's employment environment must be changed or he would deteriorate emotionally, and that returning to the same stressful environment would be detrimental to his health (AR 144). He was of the opinion that Layden could recuperate given the right atmosphere and support from his employer, and should he be able to return to work half time, that would allow him to gradually phase back into his job and restructure his job so he could function more effectively (AR 144). Mr. Bailey further opined that if his employer would not accommodate half time work, he would not be able to function in a full time capacity (AR 144).

Layden returned to Dr. Haibach on December 6, 2002 and reported he was doing better, and had decreased his Prozac dosage (AR 125). He indicated that Mr. Bailey recommended he not return to work full time but only work four hours per day (AR 125). He was considering resigning from his job, but reported he was thinking and feeling better since he had been off work for one month (AR 125). Dr. Haibach diagnosed work related stress, improving, and prescribed Ativan in addition to Prozac to help him sleep (AR 125). He gave Layden a note stating he could return to work four hours a day beginning December 9, 2002 (AR 125).

On January 6, 2003, Layden reported that he was still not working because his employer would not allow him to work part time, although he was anxious to go back to work (AR 124). He stated he was doing better at home, and his wife reported that he was less tense, but she was

concerned about his memory and thought he might have Alzheimer's (AR 124). Dr. Haibach diagnosed Layden with improved stress with underlying depression, and opined that he could have another nervous breakdown if he returned to his old job full time (AR 124). He further opined that Layden could only work fours hours a day, five days a week, or needed to find a different position (AR 124). Layden had stopped taking Ativan, but continued taking Prozac (AR 124).

On January 27, 2003, Layden reported to Mr. Bailey that he was working full days, but had only partial duties (AR 103). He claimed he was fatigued by work and did not want to quit, but could not sustain himself at his current work level (AR 103).

Layden returned to Dr. Haibach on February 4, 2003 and reported that he had been back to work for four weeks, had a lot of work related stress and was not functioning well (AR 123). He claimed he was up to about ninety percent of his normal work load and felt nervous and anxious (AR 123). He further claimed that every time he tried to work full time his health slipped (AR 123). He was still on Prozac and slept better (AR 123). On February 5, 2003, Dr. Haibach wrote a letter "[t]o whom it may concern" opining that Layden was unable to work at 100% of his work load in his current position due to stress (AR 122).

On February 19, 2003, Mr. Bailey wrote Dr. Haibach stating that Layden could not tolerate the high demands placed on him by his employer (AR 142). Mr. Bailey was of the opinion that since the company would not allow him to work part time, he was not capable of remaining employed at the company (AR 142). He was further of the opinion that it was beyond Layden's endurance capacity should he have to return to work full time (AR 142).

On March 11, 2003, Layden reported to Dr. Haibach that he had not been working for about a month and was doing "okay," although he felt somewhat depressed in the mornings since he did not have to go to work (AR 121). He requested to discontinue the Prozac, and Dr. Haibach advised him to take one every other day until his prescription ran out (AR 121). Layden was diagnosed with depression and work related exhaustion (AR 121).

Layden returned to Dr. Haibach on May 12, 2003 and claimed he felt "pretty good" and was no longer taking his Prozac (AR 120). He claimed he would arise in the morning and sit around until noon, but had joined a golf league and had no problem getting out of bed early to play golf (AR 120). He was diagnosed with work related stress and fatigue (AR 120). Dr. Haibach wrote a letter stating that he was unable to work for at least the next twelve to twenty-four months due to stress and depression (AR 119).

Mr. Bailey completed a medical report on May 12, 2003, and opined that Layden had no impairments in his activities of daily living, social functioning, or concentration, persistence and pace (AR 136-137). With respect to his content of thought, Mr. Bailey noted Layden was fearful and tended to obsess about his work situation, and his concentration, recent memory, and immediate retention and recall fluctuated due to his anxiety (AR 135-136). His prognosis was good if his anxiety and stress remained low (AR 138).

Mr. Bailey also completed a medical assessment of Layden's ability to perform work-related mental activities, opining that he had a "good" ability to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; function independently; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability; a "fair" ability to maintain attention/concentration, but his ability to make performance adjustments fluctuated depending on stress; and a "poor/none" ability to deal with work stresses (AR 139-140).

On May 15, 2003, Mr. Bailey wrote Dr. Haibach reporting that Layden had stated that his disability insurance carrier had indicated that his disability claim was "not strong enough" (AR 141). Mr. Bailey stated that his opinion on Layden's ability to work at the company had not changed (AR 141). He opined that Layden's condition was long term, and due to the severity of his anxiety and depression, he was disabled for the foreseeable future (AR 141). Mr. Bailey stated "I do not ever expect him to return to work" (AR 141).

On May 22, 2003, Richard Heil, Ph.D., a state agency reviewing psychologist, reviewed

the medical evidence of record and determined that Layden had only mild restrictions in his activities of daily living and in maintaining social functioning; moderate limitations in maintaining concentration, persistence or pace; and no repeated episodes of decompensation of extended duration (AR 158). Dr. Heil completed a mental residual functional capacity assessment form, and opined that Layden was "not significantly limited" in his ability to understand, remember and carry out short, simple and detailed instructions; sustain an ordinary routine without special supervision; work in coordination with others without being distracted; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers; maintain socially appropriate behavior; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation; was "moderately limited" in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual with regular tolerances; complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others (AR 145-146).

      Dr. Heil considered Mr. Bailey's May 2003 assessment, but found that his assessment was an overestimate of Layden's limitations and was contradicted by the medical evidence and other evidence of record (AR 147). Dr. Heil found that the limitations resulting from his impairments did not preclude him from meeting the basic mental demands of competitive work on a sustained basis (AR 147).

      Layden, his wife, and Joseph Kuhar, Ph.D., a vocational expert, testified at the hearing held by the ALJ on April 23, 2004 (AR 164-201). Layden testified that he lived with his wife, daughter, and his granddaughter (AR 168). He claimed he stopped working as a purchasing manager since he "just about had a nervous breakdown" and his doctor and psychologist advised

him not to work (AR 168). He denied suffering from sleep disturbances or difficulties with concentration, and only had problems with his memory regarding "trivial stuff" (AR 174-175). He was able to get along with his family and neighbors, and took no prescribed medication (AR 175).

Layden testified that during a typical day he was "fairly busy" until 10:00 p.m. (AR 173). He walked three to four miles at a local mall, ate breakfast, did paperwork for approximately one hour, went to a senior's center for lunch, ran errands, ate dinner, and went to a local health club approximately three nights per week to exercise (AR 173). He testified that he attended woodworking classes two nights per week and had signed up for a stained glass class (AR 175). He was also halfway through clown college and planned to do community work with children (AR 175). Layden belonged to a bowling league and played racquetball at the health club (AR 175). He was able to drive, go to the grocery store, and do repairs around the house (AR 173-174). He claimed he was able to engage in the described activities because they were not stressful and he could cancel them (AR 189).

Layden's wife testified that he was more argumentative while working in 2002 and 2003, and after he ceased working his condition improved (AR 190-191). Mrs. Layden further testified that he would not be able to perform any work because he still became a little agitated and could not handle a "stressful environment" (AR 191-192).

The ALJ asked the vocational expert if work existed for an individual of Layden's age, education and past work experience, who had no physical limitations, but had the following limitations: experiences some difficulty in the work place and should be limited to simple, routine and repetitive work not requiring close attention to detail, in a low stress environment, defined as requiring few decisions (AR 196). The vocational expert testified that such an individual could perform a job as a stock clerk, janitor cleaner, laundry worker and general plastic laborer (AR 197).

Following the hearing, the ALJ issued a written decision which found that Layden was

was not entitled to a period of disability or disability insurance within the meaning of the Social Security Act (AR 14-24). Layden's request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 4-6). He subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs

>   in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117.  The ALJ resolved Layden's case at the fifth step.  At step two, the ALJ determined that his major depressive disorder and acute stress disorder were severe impairments, but determined at step three that he did not meet a listing (AR 15-16).  At step four, the ALJ determined that Layden had the residual functional capacity to perform work that was limited to simple, routine, repetitive work that did not require close attention to detail, performed in a low stress environment, defined as one requiring few decisions (AR 16).  At the final step, the ALJ found that Layden could perform the jobs cited by the vocational expert at the administrative hearing (AR 27).  The ALJ also concluded that Layden's assertion that he was unable to work on a full time basis was not fully credible (AR 24).  Again, we must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

   As an initial matter, we must determine whether additional evidence attached to Layden's Motion should be considered by the Court in our review.  Layden attached three documents to his Motion that were not presented or considered by the ALJ or the Appeals Council.  The first document is a letter dated May 2, 2005 authored by Dr. Haibach.  *Plaintiff's Motion Ex. A*.  Dr. Haibach opined that due to Layden's problems with work related stress and depression, he was "unable to do any work at this time" including unskilled labor.  *Id*.  The second document, dated May 19, 2005, is a letter addressed to the Appeals Council authored by Layden.  *Plaintiff's Motion Ex. B*.  In this letter, Layden states that he tried to obtain the four jobs identified by the vocational expert, but that the potential employers, after reviewing his health reports, disqualified him from any employment positions.  *Id*.  Layden further states in the letter that the potential employers required a doctor's release before they would consider hiring him.  *Id*.  The last document is a letter addressed to Layden from UnumProvident dated January 19, 2005, advising him that as a result of a settlement with insurance regulators and the United States Department of Labor, he could request reassessment of his claim for long term disability.  *Plaintiff's Motion Ex. C*.

A review of the ALJ's decision and a list of exhibits reveals that this additional evidence was not considered by the ALJ or the Appeals Council. Pursuant to *Matthews v. Apfel*, 239 F.3d 589, 593 (3rd Cir. 2001), in order to qualify for a remand option, three requirements must be satisfied: (1) the additional evidence must be "new"; (2) it must be "material" to determination of the claimant's disability benefits claim; and (3) there must be "good cause" for the claimant's failure to present the new evidence in a prior proceeding. *Matthews*, 239 F.3d at 593 ("[W]hen [a] claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ.").

Dr. Haibach states in his May 2, 2005 letter that Layden is "unable to do any work <u>at this time</u>." *Plaintiff's Motion Ex. A* (emphasis added). This opinion, which disqualifies him from all work, was written a full year after the ALJ's decision. Dr. Haibach does not express the view that Layden was "unable to do any work" during the claimed disability period. Consequently, this letter is immaterial since it does not relate to the time period for which benefits were denied. *See, e.g., Wilson v. Halter,* 2001 WL 410542 (E.D.Pa. 2001), *aff'd in an unpublished opinion,* 2002 WL 130415 (3rd Cir. 2002) (medical reports relating to period of time after that addressed in the hearing are immaterial to the ALJ's decision and therefore do not warrant remand); *Ordo v. Apfel*, 2001 WL 1159856 (E.D.Pa. 2001) (remand not appropriate since new evidence did not relate back to time period for which benefits were denied).

Even if the letter of May 2, 2005 could be viewed as an inartful attempt to clarify his letter of February 5, 2003, which merely expressed the view that Layden was "unable to work at 100% of his work load in his current position", Layden has offered no explanation as to why he did not obtain Dr. Haibach's opinion at a time when it could be considered by the ALJ. *Matthews*, 239 F.3d at 593-95 ("[W]e believe that it is a much sounder policy to require claimants to present all material evidence to the ALJ and prohibit judicial review of new evidence unless there is good reason for not having brought it before the ALJ.").

10

With respect to the letter detailing his attempts to secure unskilled employment, this evidence is not material, meaning that it is not "relevant and probative" and there is no "reasonable probability that the new evidence would have changed the outcome of the Secretary's determination." *Szubak v. Sec'y of HHS,* 745 F.2d 831, 833 (3rd Cir. 1984). Whether Layden would in fact not be hired because of his mental impairments is irrelevant to the issues before the ALJ. *See* 20 C.F.R. § 404.1566(a)(3) ("We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions in the county. It does not matter whether ... [y]ou would be hired if you applied for work."); *see also Howard v. Bowen*, 664 F. Supp. 923, 925 (N.J. 1987) (an employer's reluctance to hire people who would work for only a short period of time is not relevant under the Act).

Likewise, we conclude that Layden is not entitled to a new evidence remand on the basis of the letter he received from UnumProvident informing him that he could request reassessment of his claim for long term disability since this evidence is also not "material." First, the letter merely provides that Layden could seek reassessment of his claim and is not a decision on the merits of his claim. Moreover, even if Layden was approved for benefits from his company, findings by a nongovernmental agency are not binding on the Commissioner. *See* 20 C.F.R. § 404.1504.[1]

Having concluded that we will not consider the records attached to Layden's Motion, we now direct our attention to his arguments relative to the evidence that was before the ALJ. Layden essentially argues that the ALJ erred in rejecting the opinions of his treating physician, Dr. Haibach and his psychologist, Mr. Bailey, and erred in his credibility determination. We shall address each of these arguments in turn.

---

[1] Section 404.1504 of the regulations provides: "A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a decision made by another agency that you are disabled or blind is not binding on us." 20 C.F.R. § 404.1504.

Layden first argues that the ALJ improperly rejected the opinions of Dr. Haibach and Mr. Bailey. At the outset we note that a treating physician's opinion is given controlling weight only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record" *see* 20 C.F.R. § 404.1527(d)(2), and may only be rejected on the basis of contradictory medical testimony. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988). When medical testimony conflicts or is inconsistent, the ALJ is required to choose between them. *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981). In making that choice, a treating physician's conclusions are to be examined carefully and accorded more weight than a non-treating physician's opinion. *Podedworny v. Harris*, 745 F.2d 210, 217 (3rd Cir 1984). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so. *Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

Contrary to Layden's contention, we find that the ALJ considered his treating physicians' opinions consistent with the above standards. In an opinion dated February 5, 2003, Dr. Haibach opined that Layden was unable to work at 100% of his work load in his current position due to stress (AR 122). On May 12, 2003, he opined that Layden was unable to work for at least the next twelve to twenty-four months due to stress and depression (AR 119). Mr. Bailey opined in May 2003 that Layden's condition was long term, and due to the severity of his anxiety and depression, he was disabled for the foreseeable future (AR 141).

The ALJ declined to give these opinions controlling weight based, in part, upon his conclusion that the actual determination of disability is expressly reserved to the Commissioner (AR 21). We find no error in this regard. "The ultimate decision concerning the disability of a claimant is reserved for the Commissioner." *Knepp v. Apfel,* 204 F.3d 78, 85 (3rd Cir. 2000). The pertinent regulations provide that opinions on some issues, including the opinion of whether

a claimant meets the statutory definition of disability (i.e., is "disabled" or "unable to work") are not medical opinions "but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case. ..." 20 C.F.R. § 404.1527(e).

The ALJ further concluded that Mr. Bailey's opinion and Dr. Haibach's opinions were inconsistent with the other evidence of record (AR 21). A treating source's medical opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(d)(2). Here, we conclude that the ALJ could properly decline to give Dr. Haibach's and Mr. Bailey's opinions controlling weight under these standards.

As noted by the ALJ, although Mr. Bailey clearly opined that Layden could not return to his position at the company, his reports did not state that he was incapable of performing full time work in another position (AR 21). Indeed, Mr. Bailey suggested that Layden explore the possibility of working at another job at the plant (AR 144). He was also of the opinion that given the right atmosphere and support from his employer, he could return to work part time and gradually phase back into his job (AR 144). Finally, Mr. Bailey found that he had a "good" or "fair" ability to perform a number of work-related mental activities, and, although his ability to deal with work stress was "poor", his prognosis was good if his anxiety and stress remained low (AR 138-140).

Similarly, Dr. Haibach's opinions did not preclude all work. Dr. Haibach's progress notes show that Layden was diagnosed with work stress and mild depression in September 2002, and Layden was considering retirement (AR 127). In December 2002 Layden was doing better and had decreased his dosage of Prozac (AR 125). In January 2003, Dr. Haibach noted he was improving, and recommended he work part time in his current position or he needed to find a *different position* (AR 124) (emphasis added). He opined in February 2003 that Layden was

unable to work *in his current position* due to stress (AR 122) (emphasis added). By May 2003 Layden reportedly felt "pretty good" and was no longer taking his Prozac (AR 120).

Layden also argues that the ALJ erred in relying on the opinion of Dr. Heil, the state agency reviewing psychologist, in discounting his treating physicians' opinions since he only had a "slice" of the record to review. To the contrary, Dr. Heil undertook a comprehensive review of all of the medical evidence and provided a detailed explanation for his opinion that Layden was not significantly limited or only moderately limited in a number of work related areas (AR 145-147). It is long-settled that the findings of a non-examining physician may be substantial evidence defeating contrary opinions. *Jones v. Sullivan*, 954 F.2d 125, 129 (3rd Cir. 1991) (ALJ did not err in rejecting opinion of treating physician in favor of opinions from state agency physicians, where treating physicians' opinions were conclusory and unsupported by the medical evidence). Since the ALJ analyzed the medical evidence consistent with the required standards, we find that his determination is supported by substantial evidence.

Finally, Layden challenges the ALJ's credibility determination. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(a). Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence. *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981). The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson,* 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983).

Here, the ALJ found that Layden's claim that he was unable to work full time was not fully credible (AR 24). In making this determination, the ALJ considered the medical evidence of record, the medical opinions, and Layden's own recitation of his daily activities (AR 16-22).

We agree with the ALJ that the objective findings (without repeating such findings here) do not support Layden's claims that his mental impairments prevented him from engaging in full time work. Moreover, the ALJ accommodated Layden's mental limitations in his hypothetical to the vocational expert by limiting him to simple, routine, repetitive work that did not require close attention to detail, performed in a low stress environment (AR 16).

Layden argues that the ALJ's reliance on his active lifestyle in concluding that he was not disabled was in error. It is well established in this Circuit that "disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity" nor does "sporadic and transitory activity ... disprove disability." *Smith v. Califano,* 637 F.2d 968, 971 (3rd Cir. 1981). Layden testified that on a typical day he walked three to four miles at a local mall, ate breakfast, did paperwork for approximately one hour, went to a senior's center for lunch, ran errands, ate dinner, and went to a local health club approximately three nights per week to exercise (AR 173). He attended woodworking classes two nights per week, had signed up for a stained glass class, and was halfway through clown college (AR 175). He belonged to a bowling league and played racquetball at the health club (AR 175). He was able to drive, go to the grocery store, and do repairs around the house (AR 173-174). By his own testimony, Layden claimed he was "fairly busy" until 10:00 p.m. and his participation in these activities was relatively consistent (AR 173). Consequently, Layden's own description of his activities does not support a conclusion that these activities were sporadic or transitory. We therefore find that the ALJ's credibility determination is supported by substantial evidence.

### IV. CONCLUSION

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES M. LAYDEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05-165 Erie |
| ) | |
| v. ) | |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

### **ORDER**

AND NOW, this 27th day of December, 2005, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment, or alternatively, Motion for Remand [Doc. No. 11] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 12] is GRANTED.  JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, James M. Layden.  The clerk is directed to mark the case closed.

                                                      s/ Sean J. McLaughlin
                                                      United States District Judge

cm: All parties of record.